IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WILLIAM CHEREMETEFF,[1]

    Plaintiff,

v.                                                                             CIV 01-1293 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant

# MEMORANDUM OPINION AND ORDER

Plaintiff William Cheremeteff was twenty years old when he stole a car and the police shot him in the face while apprehending him. *Administrative Record* ("*Record*") at 41-43. In 1999, at age thirty-six, he applied for benefits on the basis of this past injury. *Id.* at 87, 93, 96.

This matter is before the Court on Plaintiff's Motion to Reverse or Remand, *Doc. 8,* where he claims that the Administrative Law Judge's ("ALJ's") residual functional capacity finding is not supported by the record and thus, the hypothetical questions to the vocational expert incomplete. He also contends that the ALJ erred in not referring Plaintiff for an evaluation by a psychiatrist. *Doc. 9.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.

Plaintiff's original attorney contended that Plaintiff has a permanent brain injury due to the gunshot wound. *Id.* at 140-50. With the exception of a single treatment for bronchitis in 1983,

---

[1] Plaintiff is also referred to by the name William Baskins, which he clarified at the hearing before the ALJ. *See Record* at 30-31.

however, the Administrative Record contains no other medical records from treating physicians. *Record* at 179-80. The absence of medical records is in part because the hospital that treated Plaintiff's gunshot wound destroyed documents over ten years old. *See id.* at 97, 146, 147. It is also in part because, given his experience of waking up during treatment in the emergency room, Plaintiff is adverse to "needles" and "shy" of going to doctors. *Id.* at 43, 45, 57-58. There are no treating mental health records whatsoever.

In this appeal there is no dispute that Plaintiff is physically healthy, physically capable of taking care of himself, and physically capable of performing work. *See generally Record* at 54-56, 58-59, 64, 115; *see also id.* at 158-62 (report of the consulting physician who examined Plaintiff to evaluate his strength and flexibility and overall health). Rather, the issue is the degree to which Plaintiff's mental impairments affect his ability to work and, therefore, the type of work available to him.

I have carefully considered the entire record and find that the decision turns on whether it was unreasonable for the ALJ to fail to refer Plaintiff for an evaluation by a psychiatrist. Under the unusual circumstances presented here, I find that it was. Consequently, I will grant the motion and remand the matter to the Commissioner for further proceedings.

## I. Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d

799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

## II. Factual Background

### A. *According To Plaintiff*

Plaintiff's past work history in occupations legally is scant. He worked temporarily on a farm as a "picker" sometime during 1994, 1995, and 1996, until those farms closed. *See Record* at 33, 101, 109, 153. In 1994 and 1995 he worked, apparently intermittently, as a dishwasher. *See id.* at 109. In 1998 and 1999, he worked as janitor and dishwasher in his mother's restaurant and, with his mother now since deceased, he either was not retained or ceased working. *See id.* at 37-38, 153.[2]

Presently Plaintiff survives on food stamps and resides alone in a house his mother gave him. According to his testimony, he does "everything" around the house himself, such as cooking, cleaning, laundry, shopping and takes care of all of his personal needs. *See id.* at 31, 33-34, 48-49, 51-53, 88; *see also* 115. He is living in Columbus, New Mexico, a very small town that offers few diversions. *Id.* at 47, 50. Other than visiting his family, *id.* at 53-54, or "people in the fire department" *id.* at 45, and occasionally going out to eat when invited by a friend of his mother, *id.* at 47, he does not socialize much with others, *see id.* at 46 ("Nobody comes over. I

---

[2] In the early 1980's he worked at a pizza parlor and a plastics factory and sold newspapers, but it is unclear whether these jobs were before or after the shooting. *See Record* at 38-39, 153.

3

stay to myself a lot."); *see also id.* at 43, 58.  He engages in solitary activities, such as listening to the radio, reading at the library or at home, checking his mail, and watching television.  *Id.* at 46, 48, 50-51, 58.  He does not "really" have a hobby, *id.* at 48, but did write poetry with others before the surgery, when he "was more popular," *id.* at 121.  He sleeps irregularly.  *Id.* at 52-53.  He attributes his lack of a social life in part to others' perceptions of him.  For example, on a questionnaire he claimed that he does not have problems getting along with people "on a personal level," but that "people see me differently since I was shot."  *Id.* at 116.  He also indicated that he both does and does not have problems when he goes out in public because there are "not a lot of socable [sic] people."  *Id.*

Although Plaintiff dropped out of school in sixth or seventh grade, he later obtained a GED.  *Id.* at 36.  Although capable of driving a car, he has no driver's license as his learner's permit expired.  *Id.* at 44.  Plaintiff does look for work and sought help via vocational rehabilitation services.  However, he was recently unsuccessful in getting on a construction crew and asserts that there are few opportunities in Columbus, New Mexico.  *Id.* at 39, 43, 50-51, 89-90, 100, 106.

Plaintiff attributes his inability to hold a job for any length of time to the fact that his employers fire him.  *See id.* at 38 ("The most that I ever worked at a time was like probably between three and six months."); *id.* at 100 ("people fire me").  He attributes his inability to secure a job to people's dislike of him.  For example, at the hearing, Plaintiff testified:

> Q: Tell me what's wrong with you that keeps you from working?  I'm asking you to say what, what is it that makes you disabled?
> A: I don't know.  Probably – a lot of stuff, you know.  It's rumors.  It's, you know, like, you know, people showing off, you know.  I got shot.  We don't want to know . . .

people getting shot . . . around here.

*Id.* at 39-40 (ALJ interruptions omitted). In other written submissions to the Administration, Plaintiff likewise indicated that others dislike and/or avoid him.[3]

As for his ability to interact with others, Plaintiff testified that his temper is much worse since his injury. *Id.* at 40 ("Well, my temper is like, you know, it's not like five times larger. My temper is like 20 times, you know."); *see also id.* at 35 ("like a temper causing thing"). In his written submissions he states that his ability to get along with others is dependent on them and how he perceives them. For example, in responding to criticism he is a "reasonably" nice person, he's "positive" when "faced with changes," but that he is "not very patient" when having a disagreement with someone." *Id.* at 116-17. He does and does not have "trouble getting along with . . . supervisors and/or coworkers" depending on "if they are nice to me;" does not "spend a lot of time if they are not;" and is "versatile" in responding to changes at work "as long as they were reasonable." *Id.* at 118. He does not "like people who don't like [him]." *Id.* at 123. He further indicated that he is "not able to work. I would not remember to go to work." *Id.* at 79 (request for hearing before ALJ).

### B. *According To Social Workers And Plaintiff's Mother*

Two social workers, both licensed and one of whom is retired, have known Plaintiff and his family for six years. They have a different view of Plaintiff's capabilities and ability to work. Arlyne B. Saskill, the retired social worker, submitted a letter when Plaintiff initially filed for

---

[3] *See id.* at 119 (after the shooting, "people were different. Nobody else was shot in the face or had surgery. That's when people became uncomfortable, stopped hiring me. My woman left me;" "I stay to myself. I don't like people who don't like me;" "I used to know a lot of people, they say I'm not the same person;" "People don't like me."); *id.* at 123 ("I traveled to NM to be near my parents. After surgery they are the only people I know. People are shy of me.").

5

benefits. She indicated that while Plaintiff is capable of personal hygiene, he does not do so unless "pushed to do so;" that Plaintiff is "obsessed with his clothes," wearing military style which "must match." *Id.* at 91. She is of the opinion that Plaintiff suffers from "severe and profound depression," characterizes him as "asocial," having no friends and making no effort to make any, and states that Plaintiff withdraws during social interaction, makes comments that do not relate to the general conversation, and is afraid to use his motor scooter "for fear that someone will ask him to use it for an illegal purpose." *Id.* at 91. She further indicates that Plaintiff "has tried unsuccessfully to work. It is very unlikely that he will ever be able to maintain a job. He does not relate to people. He can learn simple tasks, but cannot follow through with any consistency." *Id.* She claims Plaintiff "denies having any problems . . . does not take responsibility for his actions . . . blames others for any mistakes of errors." *Id.* She further noted that Plaintiff's mother reported that he "has talked to himself while gesturing wildly, but that these periods have lessened over time." *Id.*

In May 1999 Plaintiff was examined by a consulting psychologist, Ken Hutchinson, concerning his mental impairments, and by a physician, John C. Lund, who evaluated Plaintiff's physical capabilities. After his application was initially denied on the basis of these evaluations, *id.* at 68, Plaintiff's mother and the other social worker wrote the Administration.

Plaintiff's mother wrote that she encouraged her son to contest the denial of benefits because when the Administration sent him to a psychologist and medical doctor "neither of [the Administration's] experts noted or remarked about the fresh cigarette burns that he had inflicted upon himself, and which were very evident to anyone, as they were on his face." *Id.* at 129. She stated that since the denial, Plaintiff

> has deteriorated markedly in the last two months. At the time of his

6

> application, he would go to the Health Center, not to be treated, but to watch the people. At that time he would also go to the Library, also to watch. He would also come each afternoon to my house to use the computer to play games. He has stopped all these activities. He rarely comes out of his house. All of his time is spent in bed.

*Id.* at 129.

Social worker Barbara Agte reiterates that Plaintiff's personal habits are poor, he is uncomfortable in public, he stares at people and is abrupt, burned himself with cigarettes because "they will be good for his complexion," could not adapt to schedule changes when he worked at restaurant, and "cannot drive an automobile because he cannot take examinations." *Id.* at 130-31. She also recommended to Plaintiff's family that "he be given medical and dental care and that he begin counseling sessions at the local mental health agency," but that "Border Area Mental Health will not see an uninsured patient, unless the patient has funds [and the family has none]." Plaintiff could apparently receive physical medical care at the "Ben Archer Clinic," but he "refuses the care offered, as the Physician's Assistant is a man." *Id.* at 131.

### *C. Consulting Psychologist and Neurologist Findings*

Dr. Hutchinson conducted a psychological evaluation by taking background information from Plaintiff and administering the Wechsler Adult Intelligence Scale-III. *Id.* at 154-57. Among other things, he made the following observations and conclusions:

> I suggest this [possible neurological damage] be looked into with more precision by attaining medical records if available. It is quite possible that there is more to this neurologically than he is able to explain. . . .
> 
> \* \* \* \* \*
> 
> [Plaintiff] was oriented to time, place and person. His verbal skills were quite good, but the organization of this verbal presentation was confusing. At times [Plaintiff] was very vague, at times just difficult to follow. It is unclear as to the cause of such confusion, but past history of drug and alcohol abuse might be related. **His**

7

> *thought processes included suspiciousness of others, and the belief that others avoid him. He may have been exhibiting some delusional thinking in those statements, but further evaluation would be required to determine this.*
>
> <p style="text-align:center">* * * * *</p>
>
> His presentation while filling out information forms and during the interview was unusual. *He went from vague to confusing when explaining his history, and had a somewhat suspicious attitude about the evaluation. His verbalizations were at times hard to track, and seemed tangential to the interview. It was as if there was an internal pressure to tell his story in his own way.*
>
> <p style="text-align:center">* * * * *</p>
>
> His Verbal IQ was 91 while his Performance IQ was 78. This 13 point difference between Verbal and Performance IQs borders on significance suggesting that [Plaintiff] processes the world more effectively utilizing verbally mediated intelligence as opposed to visually mediated intelligence. . . . His Verbal Comprehension index score was 89 while his Perceptual Organization index score was 86. As can be seen, these scores are stable, and suggest that *a great deal of the difference between Verbal and Performance IQs might be accounted for by problems with attention and concentration.* His Working Memory index score was 94 and his Processing Speed Index score was 73. This low PSI score suggests that [Plaintiff's] mental processes ware dulled and slower than expected on other aspects of the IQ testing. The overall results of the WAIS-III suggest a man whose intelligence is within the Low Average range, *who has problems with visual attention, who's working memory is adequate, but whose cognitive processing is slowed.* His scores suggest adequate math skills to manage money, but he might need assistance due to slowed cognitive processes.
>
> <p style="text-align:center">* * * * *</p>
>
> [*Plaintiff's*] *ability to understand and remember instructions is probably low-average. His capacity to concentrate on a task and persist is probably in the same range. However, he is likely to take longer than others to complete a task, and may have increased difficulties if pressured.* His capacity to interact with the general public and co-workers is perhaps limited by his suspiciousness and expectations of negative outcomes. I think he is probably able to react to changes that fit within his capabilities to succeed in. *If he feels overwhelmed by changes, his reactions may be more problematic.*

*Id.* at 155 (emphasis added).

      Dr. Hutchinson concluded that paranoid schizophrenia should be ruled out; mixed

personality order with paranoid, schizoid and antisocial traits should be ruled out; and that Plaintiff should be further evaluated for "possible neurological involvement due to a gunshot wound" and for a "thought disorder or serious personality disorder." *Id.* at 157.

The Administration did follow up on the recommendation that Plaintiff be evaluated by a neurologist, Dr. Michael Polsky, who found

> no evidence that the patient has sustained any significant structural injury from bullets, closed head injury, etc. involving his brain. The neurologic examination is nonfocal and the emotional and possibly cognitive difficulty that the psychologist believes the patient has could be entirely idiopathic or if they are "organic," appear more likely to result from substance abuse than physical trauma. Dr. Hutchinson did speculate on schizophrenia as a "rule out" diagnosis and I think that if anybody firmly believes that the patient has an organic brain syndrome (which I am not prepared to state), then he should be referred to a psychiatrist rather than a psychologist for a more in-depth assessment as to whether he is suffering from a thought disorder as opposed to an emotional disorder.

*Id.* at 184.

### D. *Nonexamining Psychiatrist Findings*

Plaintiff was not referred to a psychiatrist, however. Instead, DDS physician J. LeRoy Gabaldon, PhD., *see id.* at 3, 163, filled out a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("MRFC") based on Dr. Hutchinson's report and, apparently, Ms. Saskill's letter. His resume is not in the file, but it appears that he is a psychologist. In any event, Dr. Gabaldon did not examine Plaintiff.

Dr. Gabaldon's PRT and MRFC findings are somewhat internally inconsistent. On the PRT, Dr. Gabaldon checked "Schizophrenic, Paranoid and other Psychotic Disorders;" *id.* at 163, 169, 163 (citing listing 12.03), with "possible" "psychotic features and deterioration that are persistent (continuous or intermittent)", *id.* at 164, and "insufficient evidence" upon which to

9

evaluate the degree of limitation occasioned by "episodes of deterioration or decompensation in work or work-like settings," *id.* at 169. He also checked "Personality Disorders;" *id.* at 163, 168, with "mixed" "inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress," *id.* at 167. He further checked "Substance Addiction Disorders" are "present." *Id.* at 163, 168. However, on the MFRC form, Dr. Gabaldon only diagnosed Plaintiff with "mixed personality disorder" and considered "substance abuse" as in "alleged remission." *Id.* at 172. He did not mention schizophrenia as a diagnosis at the same time saying there is evidence of "delusional thinking, but not clear evidence of psychotic ideation." *See id.*

Also, on the PRT, Dr. Gabaldon indicated that Plaintiff's mental impairments caused "moderate" difficulties in maintaining "social functioning," *id.* at 169, while in the MRFC he indicated that the impairments cause "marked" difficulties in his "ability to interact appropriately with the general public," *id.* at 171. He stated that due to his limitations Plaintiff "should be able to engage in work that does not involve much social interaction." *Id.* at 172.

Dr. Gabaldon's MRFC is also inconsistent with what Dr. Hutchison observed and found. For example, Dr. Gabaldon found the Plaintiff has no significant limitation with understanding and memory or with the ability to sustain concentration and persistence. As emphasized above, however, Dr. Hutchison found that Plaintiff's capacity to understand and remember or concentrate on a task and persist is "probably" in the low-average range.

Nonexamining psychiatrist, Dr. Elizabeth Chiang, *id.* at 177, filled out a medical assessment form and diagnosed Plaintiff with polysubstance abuse in remission and mixed personality disorder with antisocial traits. She rated his mental impairment at "moderate" *id.* at 175, and also "affirmed" Dr. Gabaldon's PRT and MRFC assessments, *id.* at 163, 172.

10

## III. Analysis

The ALJ characterized Plaintiff's mental limitations "to the performance of simple, repetitive 1-2 processes with no public contact and limited contact with supervisors and co-workers." *Id.* at 16. Plaintiff contends that Dr. Hutchison's evaluation does not support the characterization. Defendant maintains that the characterization in essence "reflects" Dr. Hutchison's limitations and further refers to Dr. Polsky's neurological report as medical support for the ALJ's conclusion. I cannot agree.

The ALJ did not rely on Dr. Hutchison or Dr. Polsky's assessments in arriving at his conclusion about the extent of Plaintiff's mental limitations. In that portion of his opinion, the ALJ does not cite any record exhibit and does not reference his earlier discussion of Dr. Hutchison's and Dr. Gabaldon's findings. In the paragraph immediately preceding the one in which he characterizes Plaintiff's mental limitations, the ALJ primarily discusses Plaintiff's physical health and, in that connection, discusses Dr. Polsky's neurological findings. In the last part of that paragraph, the ALJ discusses mental impairments and in so doing only discusses Plaintiff's allegation of a "bad temper." He rejects Plaintiff's allegation as imposing any limitations because:

> The allegation of a "bad temper" has not been documented to impose notable limitations. Since arriving at his present domicile in this state, there is no mention of problems with the law due to his behavior. Nor does the record contain treatment reports for impairments of a psychiatric or emotional nature. There are no records from a treating source aside from the one time only consultative evaluation which reported there were no neurological impairments pertaining to the brain, spinal cord, or peripheral nerves below the neck.

*Id.* at 16. This is the extent of the ALJ's discussion concerning Plaintiff's residual functional capacity as to mental limitations.

Thus, rather than relying on Dr. Hutchison's opinion, the ALJ wholly ignored it (as well as Dr. Gabaldon's) without explanation. Evidently the ALJ instead relied on the fact that Plaintiff has never sought mental health treatment and therefore has no records to show for it. The uncontradicted evidence, however, demonstrates that Plaintiff avoids physicians and, indeed, exhibited suspicion of Dr. Hutchison's evaluation. Furthermore, Plaintiff requested that the Administration refer him to a psychiatrist based on Dr. Polsky's notation, which in turn is based on Dr. Hutchison's recommendation. The ALJ took the matter under advisement at the hearing, but did not discuss the matter further. *See id.* at 29, 64. Since I cannot conclude that the ALJ based his characterization of Plaintiff's limitations on any medical evidence of record, it follows that I cannot conclude the evidence was substantial.

Even if the ALJ was relying on Dr. Hutchison's opinion as the parties suggest, I am unable to find the ALJ's opinion based on substantial evidence. The ALJ's characterization of Plaintiff's limitations does not reflect all of Dr. Hutchison's limitations. For example, the ALJ does not include Dr. Hutchinson's observation that Plaintiff was suspicious and may have been exhibiting delusional and disordered thinking that merited further evaluation, or Dr. Hutchison's observation that Plaintiff's ability concentrate on a task and persist is "probably" in the low-average range. The ALJ did not explore these specific limitations with the vocational expert or explain why he rejected those portions of Dr. Hutchison's findings. *See id.* at 60.

Also, Social Security Ruling 85-15 recognizes that an unskilled, low-stress job may be just as difficult for someone with a mental impairment because of how the individual responds and that "an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision." *Doc. 10* at 2 (part of extensive quote from the ruling). When questioned by Plaintiff's attorney, the vocational expert indicated that difficulty in maintaining the appropriate

pace and difficulties interacting with supervisors would affect the ability to maintain employment. *Id.* at 62-63.

Accordingly, I cannot conclude that the ALJ considered all of the limitations supported by the medical evidence of record. As the Tenth Circuit pointed out in two cases from this district:

> To reach this conclusion, the ALJ had to ignore evidence in the record which conflicted with his conclusion. This he may not do. *See Switzer v. Heckler,* 742 F.2d 382, 385-86 (7th Cir.1984) (Secretary's attempt to use only portions of report "favorable to her position, while ignoring other parts, is improper"); *Smith v. Bowen,* 687 F. Supp. 902, 904 (S.D.N.Y.1988) ("Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, he cannot pick and choose evidence that supports a particular conclusion.").

*Udero v. Apfel,* 156 F.3d 1245, 1998 WL 487024 (10th Cir. 1998); *see also Burns v. Apfel,* 145 F.3d 1345, 1998 WL 278535 (10th Cir. 1998) (case where ALJ did not fully develop record by procuring "additional consultative examinations" to "clarify the existing opinions about plaintiff's limitations and ability (or inability) to work.").

The ALJ is responsible in every case to "ensure that an adequate record is developed during the disability hearing consistent with the issues raised . . . even when a claimant is represented by counsel." *Hawkins v. Chater,* 113 F.3d 1162, 1168 (10th Cir. 1997) (citation omitted); *see also* 20 C.F.R. § 404.944 (requiring the ALJ to "look[] fully into the issues"). In addition, Section 421(h) to Title 42 provides:

> Evaluation of mental impairments by qualified medical professionals
>
> An initial determination under subsection (a), (c), (g), or (i) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner of Social Security has made ***every reasonable effort*** to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity

13

assessment.

42 U.S.C. § 421(h) (emphasis added).

Defendant correctly notes that the key for residual functional capacity purposes it is not the label of a mental illness but the extent of Plaintiff's limitation. However, medical evidence regarding the extent of Plaintiff's mental impairments is inconclusive per three of the four consulting physicians used by the Administration. Dr. Hutchison observed what he deemed to suspicious thoughts and possible delusional thinking, and recommended that Plaintiff be further evaluated by a psychiatrist for his delusional thinking and to rule out schizophrenia and other diagnoses. Dr. Gabaldon's PRT checked schizophrenia with possible psychotic features but noted insufficient evidence on which to evaluate deterioration or decompensation in work settings.

Although the ALJ characterized Dr. Gabaldon as "initially" reporting schizophrenia as a diagnosis but "ultimately" rejecting the diagnosis, that conclusion does not survive scrutiny. Nowhere does Dr. Gabaldon explain that he considered and rejected schizophrenia as a mental impairment. Rather, as discussed above, his findings are at best inconsistent. In any event, Dr. Gabaldon did not reject schizophrenia on the basis of any examination of Plaintiff. If he indeed rejected schizophrenia, it apparently was based on the lack of sufficient evidence from Dr. Hutchison's evaluation.

Defendant contends that Dr. Polsky is of the opinion that Dr. Hutchison's "'rule out' diagnosis of schizophrenia was speculative." *Doc. 12* at 6. Based on the context in which the remark was made, I disagree. Dr. Polsky did not find organic brain syndrome, but concluded that if someone else did, just as with Dr. Hutchison's "rule out" diagnosis, Plaintiff should be "referred to a psychiatrist rather than a psychologist for a more in-depth assessment as to whether he is suffering from a thought disorder as opposed to an emotional disorder." Organic brain syndrome

and schizophrenia are two separate impairments. *Compare* 20 C.F.R. 404, Subpt. P, App. 1, §§ 112.02, 112.03. Either could warrant further evaluation by a psychiatrist.

The ALJ made his decision at step five. The question here is, at the very least, whether Plaintiff is delusional and how that limits the jobs he can physically perform. Other evidence appears to corroborate Dr. Hutchison's assessment. As such, I consider that Dr. Hutchison's recommendation of follow-up examination by a psychiatrist raises an issue sufficiently substantial to trigger consideration by the Administration whether to provide an additional consultative examination by a psychiatrist. *See Hawkins,* 113 F.3d at 1167-69.

Although the Secretary has broad discretion in deciding whether to order a consultative examination, if, as here, there is objective evidence of a mental limitation such as delusions and the ALJ's decision is not supported by substantial evidence, the Tenth Circuit has held that "a consultative examination is required." *Pruitt v. Chater,* 107 F.3d 21, 1997 WL 66535 (10th Cir. 1997). Therefore, I cannot conclude that the ALJ followed the correct legal standards when he failed to address and thus implicitly rejected Plaintiff's request to secure additional examination and findings from a psychiatrist.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 8)* is GRANTED, and that a final order consistent with this opinion be entered concurrently herewith pursuant to Rule 58.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.